The next matter, number 24-1499, Joanne Walsh v. HNTB Corporation. At this time, counsel for the appellant, please introduce yourself on the record to begin. Good morning. May it please the court, I am Mikayla May and together with Zachary Hammond, I represent the plaintiff appellant Joanne Walsh. We would ask to reserve one minute, Judge Montecavo, for rebuttal. You may. Thank you. Your honors, this court has jurisdiction to hear this appeal and should reverse the summary judgment decision that dismissed the age discrimination claim of a 26-year employee who was repeatedly told that she could be replaced with a younger, cheaper worker. Walsh's pro se motion appearing on page 13 of the appendix was the functional equivalent of a notice of appeal. This document was filed within 30 days of the summary judgment order and the judgment dismissing the case. This timely filing contains all of the pertinent information specified in Rule 3. First, this pro se filing named the parties, the lone plaintiff and lone defendant, because it identified them in the caption. Second, there was only one court to which Walsh could appeal. This one. Third, it was evident as of the filing of this document what was being appealed. Walsh's pro se motion immediately followed the judgment and indeed there was no other appealable order or judgment that she could appeal. Let's assume we agree with you. Okay. Um, could we move to the sort of merits issue here? Happy to do it. Um, and I'm wondering, you know, Muldrow came out, well, I think after the district court's decision, but while briefing, you were briefing here, but Muldrow, even under Muldrow, you still need adverse consequences. So you need to have a change in the terms and conditions of employment. Um, yes, your honor. So the changes in the terms and conditions of employment were here. Um, so I think it's very important to view these all in context. A reasonable employee experiences the workplace cumulatively, not as tiny action upon tiny action, but together. So here we have direct evidence of aid discrimination, both in statements to Walsh. So this always happens in these cases and it's very difficult for us. So that's not how you can have a hostile work environment claim. You can have a constructive discharge claim or you can have discrete acts that you tell us are affirmative, adverse actions. I clearly you have argued a constructive discharge claim. I'm not clear if you've argued a hostile environment claim, which would be sort of this constellation of of actions. But are you pursuing identifiable discrete acts that you say separate from constructive discharge that are adverse actions? Um, yes, your honor. I would say sort of two points to that one under Muldrow. We're not, I would say we're not confined by is it a hostile work environment? Is that a is it a constructive discharge? Those are both are adverse actions, but they're not the only ones. I would say it's really important to look at all of these pieces together and with your what does that look like as a claim? Sure. So let me step back because the context is important. So while she's being told that she and she's told us repeatedly that she and Mr. Allison, who's 59, can be replaced by younger, cheaper workers. This statement happens many times. Um, they they're um, this bias infected her pay, which was which would in effect go down indefinitely. It infected her supervisor's bullying behavior. All right. So one is pay. I love my pay was not increased because of my age. That is one of them. Yes, that is one. Okay. Um, it infects the bullying behavior in the in the humiliation she suffered in the workplace. So she is told to shut up. She is. She has job duties removed and taken away as compared to her younger peers. She lost job responsibilities. You say that's a separate adverse action. Council. Wait, can I just to clear this up? Because I think I was understanding it a bit differently. I thought because you do have to identify adverse actions and I thought that you would identify two adverse actions that you were pursuing. One was a constructive discharge. And then all of the things that you just mentioned are facts that you alleged support the constructive discharge that the conditions of the employment became in your client's view so intolerable that she felt compelled to quit. And that I understood the other adverse action that you were alleging was being placed on a pip. So I think just just just to just to focus in on what what are the adverse actions that you are alleging? Am I correct that those are the two constructive discharge and a pip? Not quite, your honor. Constructive discharge is one. The other one looks more like a hostile work environment. But again, under Muldrow, I don't think we need that label. But it's all of these things combined. And I would ask the court to look at them cumulatively through experiences. And with your honor's permission, I would go through how cumulatively those those fit. How do you analyze that differently than the hostile work environment? I just don't understand it. You're just saying there's a mash up of things that were negative, like they said bad things. I understand the pay. If you're arguing that, I understand it. But if it's just a mash up of things and it's not a hostile environment claim or separate from that, and it's separate from a constructive discharge, what is that? That doesn't seem to be what Muldrow is talking about. I do think it's a hostile work environment claim. A hostile work environment is a work environment where a person is treated adversely because of their protected class, he or her age. So we have comments that she she's going to struggle to maintain pace, even in the face of them saying she's meeting her expectations. Both supervisors say that. And even in this effusive praise that does appear in her contemporaneous performance reviews, we're seeing her being told to shut up. We're seeing her duties being taken away. So that's severe and pervasive. And the standard of your Massachusetts law is severe or pervasive. So we're seeing those things. Did you argue that before Judge Gorton? Because that's not new to the law. What is not new to the law? Hostile environment. Yeah. And so it is my memory, and I'm doing this from memory, that Judge Gorton went through hostile work environment and found that it was insufficient. It is our position that that was there. He said there was no constructive discharge. And he has a footnote that says a PIP is not an adverse action. I believe he understood. This is why I was trying to clarify. Sure. I believe he understood your claim to be constructive discharge or PIP and that the hostile environment was just what led to her deciding to resign and therefore were the background facts for the constructive discharge claim. Are you saying that you brought two separate claims, a separate hostile work environment claim and a constructive discharge claim? I don't think Muldrow invites or even permits this kind of slicing and dicing. I do think that... But Sutters says that a constructive discharge is a more egregious form of hostile environment. Yes. And I would say... I'm sorry. And so you framed it as constructive discharge? I think we framed it as both. I think this court could decide to reverse on both pieces of that or could reverse on the hostile work environment and not the constructive discharge. Can I just add... I understand your legal arguments, but just factually, I'm just trying to understand what arguments you made for your client before the district court. So just factually, let's just put Muldrow aside for a moment and maybe you could amend your complaint. What did you argue to the district court as your adverse actions in your view? So in my view, what was argued were the sort of traditional framework of a hostile work environment, of which the PIP was a piece, but it's really the background of it. It's against this PIP... Okay, so a hostile work environment and then... Yes. And constructive discharge. Okay. Thank you. So under Muldrow, and that's the controlling law here, discrimination means treat worse. So we have to look at these pieces all together. A jury is entitled to find that being told again and again that she can be replaced with younger workers, that she would struggle to maintain peace, that she was seeing her job taken away, she was seeing her pay go down, and she and Mr. Allenson resigned on the same day. Those things don't have to be a coincidence. A jury is entitled to view that they're not. The younger workers stayed. Discrimination means treat worse. We also have evidence of pretext. I think it's really important to note here that both of her supervisors testified that she met expectations in 2019 and 2020. Isn't that inconsistent though, counsel, with her actual performance review? I looked at the performance review for 2019 and the overall rating is met expectations inconsistently. Isn't that right? And that's excellent evidence of pretext because the testimony of the supervisors, the people who are working with her every day, is that she met expectations and they testified to that unequivocally. But there were written criticisms in there that seemed very much like the things that end up being in the PIP. And a lot of those criticisms a jury is entitled to find are infused with age bias. So they say she will struggle to maintain pace, but they also say her technical ability is excellent. That is, it's both stereotyping and evidence of pretext. And a lot of the criticisms of her are all these failing to stretch herself with no examples. A jury, and when she asks for examples, she's told to shut up. A jury is entitled to disbelieve those criticisms. Can I just ask a record question? The PIP ends in November of 2019 successfully, it seems. What happens between then and the time she quits, which is, I think, September of 2020? I would say it's not quite successfully. She's told she barely got off it, but she did get off it. And then from that period onward, there's continual and escalating mistreatment from her boss and particularly Mr. Avili. And so him taking away job duties, telling her she can't say no to people, telling her she needs to go tell individuals, I need to go talk to my boss. This woman's been there for 26 years and is very respected, never got any complaints. Thank you, Your Honors. Thank you, Counsel. At this time, the counsel for the appellee, please introduce himself on the record to begin. Hi, Mark Tatum and Steve Hansen from Chicardian-Bacon on behalf of HNTB, the appellee here. May it please the court. Thank you. Would you like to move directly to the substance as indicated before? Okay. So I think the court did look at this case as an adverse action issue under the prima facie elements. And that seems pretty clear from his opinion through the lens of constructive discharge. And he really looked at two primary issues. One was, and as pled in the complaint, one was the issuance of a PIP approximately one year before the resignation. And then secondly, the resignation itself and whether or not the resignation rose to the level of constructive discharge about a year later. What the court found was there were various undisputed facts. First, the resignation itself, undisputed. Second, the issue of the PIP about one year before, undisputed. Third, no change in the terms of conditions. The panel has mentioned the Mudrow case. The Mudrow case held that there is not a significance test to terms and conditions of employment, but there is an obligation to identify a harm attendant to terms and conditions. This case is overlaid, of course, with the constructive discharge claim. And the constructive discharge claim is bringing another layer. Can I just ask if, assuming that your opposing counsel, as they've argued, also presented a hostile work environment claim or even just an independent PIP claim, being placed on a PIP is quite a significant adverse action, I think, in the minds of most employees. I mean, certainly, if I worked somewhere and I was placed on a PIP, I would interpret it as an adverse action against me that would cause a great deal of stress. Yes. And when I looked at the record here, it does seem a bit vague as to why she was placed on a PIP. It's sort of a chain of phone calls from one very high executive to somebody a little bit lower to then her immediate manager. And most PIPs have pretty clear standards and goals, objectives that the employee needs to meet. And given the pretext arguments, why isn't this the kind of case that should go to a jury to see whether there really was something specific that she was failing on or whether the statements that she's not keeping pace and things like that are just a coded way of referring to her age? Well, I think you have to look at... So the court did look at the PIP. The PIP obviously was entered into the record and through plaintiff herself. There's no dispute as to its admissibility and so forth. And then I think, as the panel mentioned earlier, there are a couple of factors the court looked at and that we can look at de novo here, which is, is it consistent with what she's been communicated leading up to that point? For example, in our 2018 evaluation that was mentioned by the court, there was indications in that that she was at the bottom of expectations at that point in time that improvement was needed and responsiveness, attentiveness, and things of this nature. I understand what you're arguing and I did see that, but just if you... Returning back to my question, I just... I reading it, I don't understand what keeping pace meant from the company's perspective. And so the objective things I saw in the PIP were the IT space was messy, seems not quite enough to put somebody on a PIP, arguably a jury could so conclude, and quote unquote, hiding in the IT office. Right. The other, not keeping pace, the general resistance they mentioned, but there are no details. So isn't that the kind of situation where a jury could conclude that it's pretext? There are details fleshed out in the depositions of those, of her managers and so forth who issued the PIP and had the PIP conversation. What would you point to as sort of the best details in your client's favor? The details were telling people no, not keeping up with tickets. So she was essentially within a group in the Boston Northeast office responsible for responding to IT calls, work tickets, and that's so if your computer breaks down, you may have someone here, you call and say, I can't get my computer up. They do things like that and other things, help with hardware and software and so forth. So there were concerns about responsiveness, in other words, keeping up with the calls because your computer's down. Those were fleshed out in deposition testimony. There was concerns because they had hardware responsibilities as well with just everything being a mess and not being efficient and prioritized to actually get people a new laptop or whatever the case may be that they needed. Telling people no, just simply not responding, I can't do that, and that sort of thing, or pushing it off. So these things were fleshed out. So the question is, is... Fleshed out where though? What they say. So adding facts that they say aren't on the record. What I imagine happened, in my own mind, was these other bosses in the company had workers and they were trying to get help from her in the way you said and she wasn't that helpful. And they're complaining up their chain and then it comes across. But what she says is, none of that is there. I'm making that up based on my own vision of how a workplace functions and how this might have happened, but that's not in the record. You didn't put evidence of those people saying what I just said. And so what you are left with is a pip that says, keep your office cleaner and some gauzy stuff about stretching. So is there just a gap here in terms of really establishing why this pip happened? No, I don't think there's a gap here. I do think there was testimony about that. And you're right, this is a large organization where she's got a big customer base, for lack of a better term. And a customer base is unhappy with responsiveness and so forth. And a customer base is obviously communicating that to the chain of command within her division who has to take action. And does Charles say, that's what was told to me by... Is it Gregory? Yes. Is that what the... Charles says, Gregory told me this? That's what's being communicated to me. This is the action I need to take with my subordinate that I'm responsible for to improve this action. And it's consistent with feedback that's been provided before in written format. So I'm gonna execute that request. And I'm gonna execute this performance improvement plan. To her question, is that an adverse action to essentially enter into a performance improvement plan? And I don't think that... So is she an Atwill employee? Yes. Yes, not under a contract of any kind. And so a pip... What does a pip in your work environment... Not your work environment, but this company's work environment, what does a pip do? Well, the way AT&T operates it within the record, it's called a performance improvement plan. And essentially, it's a method of escalating concern over performance that says... And in this instance... But you're under no... I guess my point is, you're under no obligation to do that. You could just say, you're not, you're working slowly, you're leaving today. You could do that. You could do that as an Atwill employee, sure. Yeah. Why wouldn't a pip be an adverse action? Because pip is a performance evaluation. So it's no difference than an evaluation. No, but the pip is created, and I believe this one said, that if there's not improvement, then the ultimate consequence may be that you're terminated, right? That's right. So why wouldn't, from the standpoint of an ordinary employee, why wouldn't that be an adverse action? Well, if that's an adverse action under the law, in other words, identifiable harm, then how do you coach any employee? You can't do it in writing anymore. And functionally, it'd be no different than having a conversation with you and saying, your performance is poor, we got a problem, we need to approve, or you're on a bad path. Now, the difference might be... So I guess I'm inclined to agree with you to some degree, but where the pip requires the employee to do more things. I think this pip said, you will meet with Charles every 30 days or whatever it was. Now you're adding to the terms and conditions, and why under Muldrow does that now not qualify? Like, I follow the idea, I could fire you today, so a pip is grace, I'm giving you notice and warning, maybe. But once the pip puts new requirements that weren't part of your job, why does that not change? Because I think now we're starting to act as a super personnel department, frankly. How do we coach someone up? How do we set goals, and then how do we create interaction to go back and forth and say, yeah, you're improving and we're meeting them, and let's evaluate your work going forward? As the undisputed facts happened here, she successfully completed the pip and moved forward for about another 11 months in employment. How else does a company, without running afoul of this is identifiable harm to the terms and conditions of your employment, manage a person? The goal is to manage a person to success. But if Muldrow says I transfer you from here to there, and the difference is now your office is less sunny, and that's good enough. If the pip is more than just notice, but is actually telling you, now your job is going to have these components because, whether it's discipline or help or whatever, it's more indifferent. And I guess that's where I'm wondering if Muldrow changes the world a little bit in this place. Well, Muldrow certainly doesn't go that far. Or in this place, about pips. So I think we're trying to ask ourselves, does Muldrow go so far as to say an employer is essentially limited from entering into a coach you up program that may add and let's meet to ensure your success over time during this 90 day period? That's what happened here. The question then is, did Muldrow say suddenly can't do that? And it doesn't say that. Well, it says you can do it. You just can't do it for illegal reasons. So, I mean, that's the premise of Muldrow. Any other questions? Counsel for the appellant, please reintroduce yourself on the record. You have a one minute rebuttal. Thank you. Michaela May for the appellant. This all shows how very fact of intensive this analysis is. But Muldrow tells us we don't need to satisfy any adverbs. It doesn't need to be material. It doesn't need to be substantial. It doesn't need to be all of these other things. This pip told Ms. Walsh that after 26 years, she was facing termination, and she was facing termination for criticisms that a jury can infer are age biased. I would go back to the issue of pretext because I do think this is so important. A lot of the pip is nonsensical. So they say, for example, she spends too much time in her office, but she is remotely supporting offices throughout the Northeast. She literally has to be in her office to do it. The pip contradicts her contemporaneous performance reviews. A jury is entitled to look at all of these things and disbelieve the genuineness of the pip and to see that this was an effort, as Walsh understood it to be, to terminate her from her employment. Thank you. Thank you, counsel. That concludes argument in this case.